NOURSE & BOWLES, LLP
Attorneys for Petitioner
FIRST AMERICAN BULK CARRIER CORPORATION
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030
(212) 952-6200

DEC 12 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIRST AMERICAN BULK CARRIER CORPORATION, Petitioner, | 07 CV 11194 Civ. ( ) |
| - against - | **VERIFIED PETITION TO COMPEL ARBITRATION AGAINST <u>STRONG VESSEL OPERATORS LLC</u>** |
| VAN OMMEREN SHIPPING (USA) LLC and STRONG VESSEL OPERATORS LLC, Respondents. | |

Petitioner, First American Bulk Carrier Corporation ("Petitioner"), by its attorneys Nourse & Bowles, LLP, as and for its Verified Petition against respondents, Van Ommeren Shipping (USA) LLC ("Van Ommeren") and Strong Vessel Operators LLC ("Strong") (collectively "Respondents"), alleges on information and belief as follows:

1. At all material times, Petitioner was and is a corporation organized and existing under the laws of the State of Delaware and had its principal place of business in Reno, Nevada.

2. Upon information and belief, Van Ommeren had, at one time, been a corporation organized and existing under the laws of Delaware with an office and place of business at

46 Southfield Avenue, Stamford, Connecticut but Van Ommeren appears to no longer be in active business.

3.    Upon information and belief, Strong is a corporation organized and existing under the laws of Delaware with an office and place of business at 68 Southfield Avenue, Stamford, Connecticut 06902 and is the de facto successor in interest and alter ego of Van Ommeren and has succeeded to it business.

4.    Pursuant to the provisions of United States Arbitration Act, 9 U.S.C. § 1 et seq., including 9 U.S.C. § 4, Petitioner seeks to compel respondent, Strong, to arbitrate in addition to Van Ommeren became Strong is the de facto successor in interest and alter ego of Van Ommeren.  Federal jurisdiction exists under the admiralty and maritime jurisdiction of this Honorable Court, Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S. Code § 1333.

5.    On or about February 3, 1999, Petitioner, as bareboat charterer, chartered the vessel M/V CHESAPEAKE BAY ("Vessel") to Van Ommeren, as charterer.  A copy of the charter is annexed hereto as Exhibit "A".

6.    Disputes have arisen under the charter between Petitioner and Van Ommeren and each has appointed its arbitrator in accordance with the arbitration clause although a third arbitrator has not yet been appointed and no hearings have yet taken place.

7.    The dispute in question include claims, in indemnity, which Petitioner has paid arising from certain injuries to certain Vessel officers and damage to certain equipment caused by incidents for which charterer, Van Ommeren and its de facto successor in interest and alter ego, Strong, should have liability under the charter.

8.    More specifically, Van Ommeren Shipping (USA) LLC subchartered the vessel to the Military Sealift Command which required that the Vessel be equipped with a certain crane with which the Vessel had not been equipped. In furtherance of that subcharter, a crane was placed on board the Vessel but on condition that Van Ommeren Shipping (USA) LLC accept full responsibility for, among other things, the crane, its operator, operations and associated equipment. In addition, Van Ommeren Shipping (USA) LLC provided the plan, instructions, lashing and securing equipment to secure the crane to the Vessel.

9.    Thereafter, two of the vessel officers were seriously injured in separate incidents involving the crane under circumstances in which Van Ommeren Shipping (USA) LLC and the crane owner should have liability. These officers, however, sued Petitioner (and others including Van Ommeren Shipping (USA) LLC) and Petitioner paid substantial sums in compromise of those injury claims without prejudice to seeking indemnity and contributions.

10.    In addition, Petitioner was forced to defend an action commenced by the crane owner for damages alleged to the crane, resulting in Petitioner being forced to defend and settle that action in circumstances in which Van Ommeren Shipping (USA) LLC had liability to pay said amounts.

11.    It is indemnity for these sums which Petitioner has paid, together with the legal costs of defense expended by Petitioner, that is the subject of an arbitration under the charter party between Petitioner and Van Ommeren Shipping (USA) LLC.

12.    Recently, Petitioner has learned that Van Ommeren has ceased active business under that name because its license to conduct business under that name has expired. Instead,

it now appears that the business of Van Ommeren is now being conducted by Strong. Attached as Exhibit "B" is a copy of a page from Strong's website outlining these points.

13. By reason of the foregoing premises, Petitioner seeks to arbitrate with Strong, as the de facto successor in interest and alter ego of Van Ommeren. Petitioner has requested that Strong do so but Strong has, to date, not agreed. A copy of Petitioner's request is attached as Exhibit "C".

14. Because of a possible time bar, Petitioner seeks, in this Petition, an order from this Court, pursuant to 9 U.S. Code § 4, directly that Strong also arbitrate with Petitioner as de facto successor in interest and alter ego of Van Ommeren.

WHEREFORE, Petitioner respectfully prays that an order be entered directing respondent, Strong, also arbitrate with Petitioner under the subject charter as de facto successor in interest and alter ego of Van Ommeren.

Dated: New York, New York
December 12, 2007

Respectfully submitted,

NOURSE & BOWLES, LLP
Attorneys for FIRST AMERICAN BULK CARRIERS CORPORATION

By:_______________________
Julia M. Moore (JMM-9778)
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030
(212) 952-6200

**VERIFICATION**

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

JULIA M MOORE, being duly sworn, deposes and says:

I am an associate of the firm of Nourse & Bowles, LLP, attorneys for petitioner herein and I have read the foregoing Verified Petitioner and know the contents thereof and that the same are true to my own knowledge, except as to the matters herein stated to be alleged on information and belief, and as to those matters I believe them to be true.

The source of my information is documents, records and other information submitted to me on behalf of the plaintiff.

This verification is made by me because Petitioner is located outside of the district of this Court.

JULIA M. MOORE

Sworn to and subscribed to
before me this 12th day of
December, 2007

Notary Public

Karlene S. Jackson, Notary Public
State of New York, #01JA5083169
Qual. In Queens Cty;
Commission Expires November 17 2009

# Exhibit A

Copyright © 1981 and Published by: The Association of Ship Brokers & Agents (U.S.A.), Inc. (ASBA), New York. This derivative work may not be copied without the permission of the copyright owners. Code Name: ASBATIME

EXHIBIT
Gui-f+ 3
SUSAN L. COHEN
DATE: 5-9-01

# TIME CHARTER

## New York Produce Exchange Form

November 6th, 1913 — Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981

THIS CHARTER PARTY, made and concluded in ..Stamford, CT......... 3rd ............ day of February.............. 1999.......

**Owners**

between First American Bulk Carrier Corporation, disponent ... ........................ Owners of the good USA Flag ............... ~~Steamship~~/Motorship MV. CHESAPEAKE BAY......

**Description of Vessel**

of ......................... of ............... tons gross register, and ............... tons net register, having engines of ..................... horsepower and with hull, machinery and equipment in a throughly efficient state, and classed ..highest class ABS...................... of about .............................. cubic feet grain/bale capacity ........... ..........................................................., and about ..................... long/metric tons deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding ................ long/metric tons) on a salt water draft of .................... on summer freeboard, inclusive of permanent bunkers, which are of the capacity of about ............................................ long/metric tons of ...................................... fuel oil and .................... long/metric tons of ..See Clause 28.............................. and capable of steaming, fully laden, under good weather conditions about ............... knots on a consumption of about ...................... long/metric tons of ................................................. ......................................................... now ....trading.......................................................... ............................................................... and

**Charterers**

Van Ommeren Shipping (USA)LLC........................................ ................ Charterers of the City of .Stamford, Connecticut....

**Duration**

The Owners agree to let and the Charterers agree to hire the vessel from the time of delivery for ~~about~~ one Timecharter trip via safe port(s) safe berth(s), safe anchorage(s), always afloat, always within.... Institute Warranty Limits, via USGulf and/or USEC/Baltic-A/or NW Europe ~~within below mentioned trading limits.~~

**Sublet**

Charterers shall have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers shall remain responsible for the fulfillment of this Charter.

**Delivery**

Vessel shall be placed at the disposal of the Charterers on arrival pilot anytime day or night Sundays & Holidays included. Lake Charles, Louisiana ........................................... ........................................................... ~~In such dock or at such berth or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in Clause 6) as the Charterers may direct. If such dock, berth or place be not available, time shall count as provided in Clause 6.~~ Vessel on her delivery shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear simultaneously (and with full complement of officers and crew for a vessel of her tonnage), to be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive

**Dangerous Cargo**

nature unless carried in accordance with the requirements or recommendations of the proper authorities of the state of the vessel's registry and of the states of ports of shipment and discharge and of any intermediate states or ports through whose waters the vessel must pass. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

**Cargo Exclusions**

livestock of any description, arms, ammunition, explosives .............. ......................................................... ......................................................... ......................................................... .........................................................

**Trading Limits**

The vessel shall be employed in such lawful trades between safe ports and places ~~within~~ ................................................ ........................... ~~excluding~~ ........................ ......................................................... ......................................................... ......................................................... as the Charterers or their agents shall direct, on the following conditions:

**Owners to Provide**

1. The Owners shall provide and pay for the insurance of the vessel and for all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the crew; shall maintain vessel's class and keep her in a thoroughly efficient state in hull,

machinery and equipment for and during the service.

**Charterers to Provide**

2. The Charterers, while the vessel is on hire, shall provide and pay for all the fuel except as otherwise agreed, port charges, pilotages, towages, agencies, commissions, consular charges (except those pertaining to individual crew members or flag of the vessel), and all other usual expenses except those stated in Clause 1, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew shall be for Owners' account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this Charter shall be for Charterers' account. ~~All other fumigations shall be for Charterers' account after vessel has been on charter for a continuous period of six months or more.~~

~~Charterers shall provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners shall allow them the use of any dunnage and shifting boards already aboard vessel.~~

**Bunkers on Delivery and Redelivery**

3. The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the vessel as hereunder. The vessel shall be delivered with: bunkers as on board ~~long/metric* tons of~~ fuel oil at the price of US $70.00 per metric ton; ~~tons of~~ diesel oil at the price of US$125.00 per ton. The vessel shall be redelivered with: bunkers remaining on board ~~tons of~~ fuel oil at the price of US$70.00 metric per ton; ~~tons of~~ diesel oil at the price of US$125 metric per ton

(*Same tons apply throughout this clause)

**Rate of Hire**

4. The Charterers shall pay for the use and hire of the said vessel at the rate of US$10,000 (Ten Thousand Dollars) including officers & crew overtime daily, ~~or~~ United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on ........ summer freeboard, per calendar month,~~ commencing on and from the day of her delivery, as aforesaid, ~~and at and after the same rate for any part of a month;~~ hire shall continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless vessel lost) at on arrival pilot station Charleston, SC

**Redelivery Areas and Notices**

unless otherwise mutually agreed. Charterers shall give Owners not less than 5/2/1 days notice of vessel's expected date of redelivery ~~and probable port~~

**Hire Payment and Commencement**

5. Payment of hire shall be made so as to be received by Owners or their designated payee in New York, i.e. See Clause 30 in United States Currency, in funds available to the Owners on the due date, semi-monthly in advance, and for the last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day as it becomes due, if so required by Owners. Failing the punctual and regular payment of the hire, or on any breach of this Charter, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

Time shall count from 7 A.M. on the working day following that on which written notice of readiness has been given to Charterers or their agents before 4 P.M., but if required by Charterers, they shall have the privilege of using vessel at once, in which case the vessel will be on hire from the commencement of work.

**Cash Advances**

Cash for vessel's ordinary disbursements at any port may be advanced, as required by the Captain, by the Charterers or their agents, subject to 2½ percent commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

**Berths**

6. Vessel shall be loaded and discharged in any dock or at any berth or safe anchorage place that Charterers or their agents may direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely lie aground.~~

**Spaces Available**

7. The whole reach of the vessel's holds, decks, and usual places of loading (not more than she can reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel.

**Prosecution of Voyages**

8. The Captain shall prosecute his voyages with due despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to perform all cargo handling at their expense under the supervision of the

Captain, who is to sign the bills of lading for cargo as presented in conformity with mate's or tally clerk's receipts. However, at Charterers' option, the Charterers or their agents may sign bills of lading on behalf of the Captain always in conformity with mate's or tally clerk's receipts. All bills of lading shall be without prejudice to this Charter and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter and any bills of lading or waybills signed by the Charterers or their agents or by the Captain at their request.

**Bills of Lading**

**Conduct of Captain**

9. If the Charterers shall have reason to be dissatisfied with the conduct of the Captain or officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

**Supercargo and Meals**

10. The Charterers are entitled to appoint a supercargo, who shall accompany the vessel and see that voyages are prosecuted with due despatch. He is to be furnished with free accommodation and same fare as provided for Captain's table, Charterers paying at the rate of US$10.00..... per day. Owners shall victual pilots and customs officers, and also, when authorized by Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc., Charterers paying at the rate of US$8.00....... per meal for all such victualling.

**Sailing Orders and Logs**

11. The Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep full and correct deck and engine logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the course of the vessel, distance run and the consumption of fuel.

**Ventilation**

12. The Captain shall use diligence in caring for the ventilation of the cargo.

**Continuation**

13. ~~The Charterers shall have the option of continuing this Charter for a further period of~~ ..........................................................

**Laydays/ Cancelling**

14. If required by Charterers, time shall not commence before ........ 0600 hours March 15, 1999... and should vessel not have given written notice of readiness on or before .March 18, 1999............... but not later than 4 P.M. Charterers or their agents shall have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

**Off Hire**

15. In the event of the loss of time from deficiency and/or default of officers or crew or deficiency of stores, fire, breakdown of, or damages to, hull, machinery or equipment, grounding, detention by average accidents to ship or cargo unless resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the vessel, the payment of hire and overtime, if any, shall cease for the time thereby lost. Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off hire shall be for Owners' account. In the event of the vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to rivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

**Total Loss**

16. Should the vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once.

**Exceptions**

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, and errors of navigation throughout this Charter, always mutually excepted.

**Liberties**

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

**Arbitration**

17. Should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision, or that of any two of them, shall be final and for the purpose of enforcing any award this agreement may be made a rule of the Court. The arbitrators shall be commercial men conversant with shipping matters.

**Liens**

18. The Owners shall have a lien upon all cargoes and all sub-freights for any amounts due under this Charter, including general average contributions, and the Charterers shall have a lien on the ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once.

Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the vessel.

**Salvage**

19. All derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's proportion.

**General Average**

General average shall be adjusted, according to York-Antwerp Rules 1974, at such port or place in the United States as may be selected by the Owners and as to matters not provided for by these Rules, according to the laws and usage at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owners, must be furnished before delivery of the goods. Such cash deposit as the Owners or their agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Owners before delivery. Such deposit shall, at the option of the Owners, be payable in United States money and remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

**York-Antwerp Rules**

Charterers shall procure that all bills of lading issued during the currency of the Charter will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 1974 and will include the "New Jason Clause" as per Clause 23.

**Drydocking**

20. ~~The vessel was last drydocked .................................... The Owners shall have the option to place the vessel in drydock during the currency of this Charter at a convenient time and place, to be mutually agreed~~ upon ~~between Owners and Charterers, for bottom cleaning and painting and/or repair as required by class or dictated by circumstances. Payment of hire shall be suspended upon deviation from Charterers' service until vessel is again placed at Charterers' disposal at a point not less favorable to Charterers than when the hire was suspended.~~ ......................................

No drydocking unless in case of emergency.......................

..........................................................................

**Cargo Gear**

21. ~~Owners shall maintain the cargo handling gear of the ship which is as follows~~: ..........................................................................

..........................................................................

..........................................................................

~~providing gear (for all derricks or cranes) capable of lifting capacity as described.~~ Owners shall also provide on the vessel for night work lights as on board, but all additional lights over those on board shall be at Charterers' expense. ~~The Charterers shall have the use of any gear on board the vessel. If required by Charterers, the vessel shall work night and day and all cargo handling gear shall be at Charterers' disposal during loading and discharging.~~

**Stevedore Stand-by**

~~In the event of disabled cargo handling gear, or insufficient power to operate the same, the vessel is to be considered to be off hire to the extent that time is actually lost to the Charterers and Owners to pay stevedore stand-by charges occasioned thereby. If~~ required by the Charterers, the Owners are to bear the ~~cost of hiring shore gear in lieu thereof~~.

**Crew Overtime**

22. ~~In lieu of any overtime payments to officers and crew for work ordered by Charterers or their agents, Charterers shall pay Owners $ .............. per month or pro rata.~~

**Clauses Paramount**

23. The following clause is to be included in all bills of lading issued hereunder:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further.

This Charter is subject to the following clauses all of which are to be included in all bills of lading issued hereunder:

**New Both-to-Blame Collision Clause**

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off,

recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

**New Jason Clause**

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

**War Clauses**

(a) No contraband of war shall be shipped. Vessel shall not be required, without the consent of Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces).

(b) If such consent is given by Owners, Charterers will pay the provable additional cost of insuring vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of ........................... In addition, Owners may purchase and Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, vessel shall not be required to enter or remain at any such port or zone.

(c) In the event of the existence of the conditions described in (a) subsequent to the date of this Charter, or while vessel is on hire under this Charter, Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.

**Ice**

24. The vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging.

**Navigation**

25. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners shall remain responsible for the navigation of the vessel, acts of pilots and tug boats, insurance, crew, and all other similar matters, same as when trading for their own account.

**Commissions**

26. ~~A commission of ................. percent is payable by the vessel and Owners to~~ ..........................................................

..........................................................................

~~on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.~~

**Address**

27. ~~An address commission of .................................. percent is payable to~~ ..........................................................

..........................................................................

~~on hire earned and paid under this Charter.~~

**Rider**

Rider Clauses .28 through 38............................ as attached hereto are incorporated in this Charter.

| CHARTERERS | OWNERS |
|---|---|
| Van Ommeren Shipping (USA)LLC | First American Bulk Carriers Corporation |
| By [signature] ________________ | By ________________ |

RIDER CLAUSES TO MV CHESAPEAKE BAY/VOS(USA) LLC
CHARTER PARTY DATED 3rd FEBRUARY, 1999

28.

MV CHESAPEAKE BAY

| | | |
|---|---|---|
| Length, Overall | 206.00M | |
| Length, Between Perpendicular | 198.39M | |
| Beam, Molded | 32.20M | |
| Depth, Molded, to Upper Deck | 18.80M | |
| Draft, summer (Keel) | 11.51 | |
| Displacement at Summer Draft | 48,935 | Metric Tons |
| Deadweight at Summer Draft | 36,004 | Metric Tons |
| Lightship Weight | 13.029 | Metric Tons |
| Service Speed | 18.0 Knots | |

| Container Capacity | 20 | 40 |
|---|---|---|
| Maximum 20' with Minimum 40' | 2231 | 0 |
| Minimum 20' with Maximum 40' | 51 | 1179 (5 high) |
| | 51 | 1090 (5 high) |
| | 49 | 975 (3 high) |

| Container Stowage | 20' | 40' (using min 20'/max 40') |
|---|---|---|
| On Deck | 35 | 627 |
| Under Deck | 16 | 552 |
| Total | 51 | 1179 |

Refrigerated Container Receptacles 308 440 Volts 60 Cycles 60 Hz

SHP - Normal 17,766

SHP - Maximum 19,740

Cruising Radius (Nautical Miles) 26,000
Fuel Consumption CST 380 53 Metric Tons Per Day

| Register Tonnage | GROSS | NET |
|---|---|---|
| Int'l | 31,920.00 | 11,480.00 |
| USA | 30,642.31 | 20,522.00 |
| Panama | 33,882.53 | |
| Suez | 33,348.25 | |

| | |
|---|---|
| Fuel Oil Capacity | H.F.O. 3,732 Metric Tons |
| Salt Water Ballast Capacity | 10,506.5 Metric Tons |
| Generator Capacity | 3 x 1470 KW (440 volts) |



RIDER CLAUSES TO MV CHESAPEAKE BAY/VOS(USA) LLC
CHARTER PARTY DATED 3rd FEBRUARY, 1999

29. **FINANCIAL RESP CLAUSE:**

This Clause applies only for port and canal transit between South Carolina, Florida, Texas, Chile, and the Panama Canal.The Vessel always to be in possession of FMC Certificate of Financial Responsibility. Notwithstanding any terms and conditions stated elsewhere in this Charter Party, it is warranted that during the currency of the Charter Party the Owners will fully comply with US Water Quality Improvement Act 1970 and subsequent Act and Rules or Regulations issued thereunder. Should any delay to the vessel or any extension of the voyage occur from failure to comply with the said Act, Rules, Regulations or Oil Pollution Legalisation the vessel to be considered off-hire for the period of such delay or extension. The Owners hereby accept responsibility of all consequences and agree to indemnify the Charterers against all claims, liabilities and costs which result from the Owners failure to fully comply with the said Acts, Rules, Regulations or Oil Pollution Legislation. It is understood that Owners will not be considered to be in default of any of the provisions of this Clause where they are not able to produce Certificates of Financial Responsibility in respect of Oil Pollution Legislation which are not obtainable from the International Group P and I Clubs under standard conditions of cover. In the event that Owners are unable to produce such Certificates due to the reasons as given above then Charterers to have the option, declarable within two working days whereupon the Charterers shall redeliver the vessel to the Owners in accordance with Clause 4, if vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near open and safe port as directed by the Charterers, after consultation with the Owners, or if vessel has no cargo on board, at the port at which vessel then is or if at sea at a near open and safe port as directed by the Owners, in consultation with the Charterers. In all cases hire shall continue to be paid in accordance with Clause 4 and except as aforesaid all other provisions of this Charter shall apply until redelivery.

30. Hire shall be remitted by telegraphic transfer to Owners' bank as:

Bank of America Nevada
Las Vegas, Nevada
ABA: 122400724
Credit: W/C - Personal Trust
Account # 990106437
For Further Credit to:
Trust Account Name: First American Bulk Carrier Corp
Trust Account Number: 40-40-882-1070900

31. ~~Charter to have the option to take delivery of the vessel in Houston on February~~ 27, 1999, and to make an interim USG/Chile round ~~trip on the same~~ terms and conditions of this charter. Upon ~~return from Chile~~ the vessel would remain on hire to perform the ~~USGulf/Baltic Round~~trip.

RIDER CLAUSES TO MV CHESAPEAKE BAY/VOS(USA) LLC
CHARTER PARTY  DATED 3rd FEBRUARY, 1999

32. If the vessel calls at any U.S. port for purposes of loading and discharging cargo,
vessel's equipment  shall comply with regulations established by U.S. Public Law 85-742
Part 9 and/or any amendments thereto (Safety and Health Regulations for Longshoring).
If Longshoremen are not permitted to work due to failure of the Master and/or Owners
and/or Owners' Agents to comply with the aforementioned regulations any delay resulting
therefrom and any stevedore standby time and other expenses involved shall be for the
Owners' account.

33.  Owners guarantee that vessel is entered and shall remain for duration of Charter in a
Protection and Indemnity Association.    Owners P&I Club:    Steamship Mutual
Underwriting Association.  Charterers have the benefit of Owners' P&I Club cover so far
as Club rules permit.

Liabilities for cargo claims shall be settled as between Owners and Charterers in
accordance with the N.Y.P.E. INTERCLUB Agreement  1996, and any subsequent
amendments thereto.

Claims in respect of alleged saltwater damage to the cargo or claims in respect of alleged
unseaworthiness of the vessel, will be passed onto Owners.  Other cargo claims will be
handled by the Charterers and Owners hereby undertake to pay their share of the claim
without delay to Charterers or alternatively to pay their share direct to the claimants if so
required provided any settlement is approved by Owners/their P&I Club.  Owners agree to
Charterers giving time-extension on Owners' behalf, provided any consents of the
Owners' P&I Club required as a condition to P&I club coverage are first obtained..

Charterers will notify Owners immediately after having given the extension together with
details of the claim.

34.  Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or
place by the shore and/or port labour and/or the tug boats and/or the pilots, or by the
Government and/or any Authority, by reason of vessel's flag or the terms and conditions
on which members of the Officers/crew are employed on this vessel or any other vessel
under the same Ownership, management operation or control, or by reason of vessel's
construction and/or her cargo gear and/or her fittings and/or her other equipment, all
consequences and any extra expenses incurred therefrom to be for Owners' account and
Charterers are entitled to put the vessel off-hire for any time lost by such reason.

35.  Normal quarantine time and expenses to enter ports for Charterers' account but any
time of detention and expenses for quarantine due to pestilence, illness, etc., of the
vessel's Master, Officers and crew to be for Owner's account, except for Charterers'
account if due to cargoes carried, as long as the vessel remains within her trading limits
under the present Charter Party.



RIDER CLAUSES TO MV CHESAPEAKE BAY/VOS(USA) LLC
CHARTER PARTY DATED 3rd FEBRUARY, 1999

36. Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by Charterers' employees, but Owners to be responsible for any such acts of their own Officers and/or crew. Charterers to remain responsible for detention of the vessel due to smuggling committed by Charterers' employees only.

37. Charterers shall furnish Master from time to time with all requisite instructions and sailing directions, in writing or by telegrams and the Master shall keep a full and correct log of the voyage or voyages, showing interalia, the course of the vessel and distance run and the consumption of fuel oil, which is to be patent to the Charterers or their Agents, a true copy of which is to be sent to Charterers from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the Master deems necessary. Charterers to keep Owners closely advised of vessel's itinerary.

Master to assist Charterers with any information required.

38. Should any damage be caused to the ship or fittings by Charterers or their servants including stevedores, Master is to notify Charterers or their agents within 24 hours after the Master and/or crew ascertain and are reasonably able to report such damage, except in case of hidden damage, and as soon as possible have a survey made to define and evaluate the damage in agreement with Charterers' representative if available, unless damage should have been repaired in the meantime. Charterers shall not be liable for any damage not so reported. Damage affecting vessel's seaworthiness, class or future trading is to be repaired before redelivery at Charterers' time and expense. Any damage other than the above mentioned may be similarly repaired or shall be assessed as to cost by the Charterers and Owners' Surveyors and deferred to a time convenient to Owners. The agreed cost to be paid to Owners with a final hire settlement. However, any damage sustained during loading which is only discovered at the time of discharge and proven by off-hire survey, will be acknowledged by Charterers.



Van Ommeren

Stamford, March 16, 1999

Addendum No. 1 to M/V "Chesapeake Bay / VOS(USA)LLC
Charter Party Dated February 3, 1999

1. It is hereby agree and understood that the vessel has delivered to Charterers on Monday March 15, 1999 at 12:00 hours in Galveston, Texas.
2. Clause 31 is deleted.

Otherwise all terms and conditions remain unchanged.

Owners

Charterers

JUN-01-1999 TUE 02:21 PM NICHOLAS BACHKO CO FAX NO. 732 738 8998 P. 02

03/16/1999 11:23 VOSUSA → 917327388998 NO.058 002

Van Ommeren

Stamford, March 16, 1999

Addendum No. 1 to M/V "Chesapeake Bay / VOS(USA)LLC
Charter Party Dated February 3, 1999

1. It is hereby agree and understood that the vessel has delivered to Charterers on Monday March 15, 1999 at 12:00 hours in Galveston, Texas.
2. Clause 31 is deleted.

Otherwise all terms and conditions remain unchanged.

Owners Charterers

Van Ommeren

Addendum No. 2 to M/V "Chesapeake Bay" / VOS(USA)LLC
Charter Party Dated February 3, 1999

1. It is hereby agreed that the time charter is extended by minimum 4 / maximum 6 months.

2. Charterers are allowed two off-hire periods during this charter at Charleston, SC, not to exceed 30 days in total. The vessel will be off-hire on arrival pilot station Charleston and go back on-hire on dropping outbound pilot Charleston. Bunkers consumed during off-hire period(s) to be for Owners' account.

3. The charter hire between the first and second Charleston off-hire will be $ 14,000 per day, whilst the charter hire for the balance of the period charter will be $ 21,500 per day.

All other terms and conditions remain unchanged.

Owners

Charterers

June 1, 1999

Addendum No. 3 to M/V CHESAPEAKE BAY/ VOS (USA) LLC
Charter Party Dated February 3, 1999

1. On – Off Hire Survey

There will be an on-hire survey, to inspect and document the condition of the cargo hatch covers, handrails, gratings and hatch coamings prior to the vessel departing Charleston, SC.

Prior to redelivery, the parties shall inspect the vessel and determine if any cargo related damages occurred during the voyage. In the event damages have been sustained, both parties will appoint a surveyor to conduct an off-hire survey, which will be compared to the on-hire survey, and the extent of damages that the vessel sustained during the voyage will be documented.

The cost of the on-hire survey will be shared equally between both parties, and in the event that an off-hire survey is required, the cost of it will be shared equally between Owners and Charterer's.

2. Cargo Gear

The Charterer shall provide a DEMAC 440 ton mobile crane, along with a spreader, crane mat, outriggers, and other miscellaneous materials with which to load and discharge cargo during the upcoming TURBOCAD 99 voyage. The Charterer shall contract and pay for the services of a naval architect to inspect the vessel and verify the suitability of the Vessel's hatch covers and coamings to support the crane and matting. Any modifications to the vessel that are required to provide for the proper operation of the mobile crane are to be for the account of the Charterer, including but not limited to the removal and replacement of the handrails between the hatch covers and the fabrication of bridging to support the matting/crane.

The Charterer shall be responsible for the loading, securing, operation and discharge of the crane during the voyage, including the furnishing of a crane operator as required by the Military Sealift Command contract requirements.

The Charterer is solely responsible for the cargo operations when using the DEMAC mobile crane, and shall bear all costs associated with the use of this crane, including stevedore costs for loading, securing and unloading the crane, as well as the crane operator, fuel, lubes and other parts necessary to perform cargo operations when using the mobile crane. Any delays that result from the inability of the mobile crane to perform in accordance with the requirements of the contract with the Military Sealift Command shall be for the account of the Charterer. The vessel is not to be placed off-hire as a result of the non-performance of the DEMAC mobile crane.

3. Crew Overtime

In the event that the crew is required to perform work relating to cargo operations on an overtime basis, including lashing/unlashing of cargo, movement of the mobile crane and/or mats and fueling/maintenance of the mobile crane, these costs are to be reimbursed by the Charterer to the Owner. The Owner will provide the necessary supporting documentation when invoicing the Charterer.

4. Damage to Vessel

The Charterer shall pay for all damages sustained to the vessel which are resultant from cargo operations, including stevedore damages, damages resultant from the loading, moving, operation and/or discharging of the DEMAC mobile crane or other related items.

The Master shall notify the Charterer and/or their agents, and the party causing such damage in writing as soon as practical prior to redelivery but not later that twenty-four (24) hours after any damage is discovered. Such notice shall specify the damage in detail and the Charterer shall be invited to appoint a surveyor to assess the extent of such damage.

In the case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterer shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required approved by the Vessel's classification society.

Any and all damage(s) not described under the paragraph above shall be repaired at the Charterer's option, before or after delivery concurrently with the Owner's work. In such case no hire and/or expenses will be paid to the Owner's except and insofar as the time and/or expenses required for the repairs for which the Charterer is responsible.

Otherwise all terms and conditions remain unchanged.


Owners                                        Charterers



Van Ommeren

**Addendum No. 3 to M/V "Chesapeake Bay" / VOS(USA)LLC
Charter Party Dated February 3, 1999**

1. It is hereby agreed that the time charter is extended by minimum 8 / maximum 10 months, rather than the minimum 4 / maximum 6 months as agreed in Addendum No. 2 – Clause 1.
2. Charterers are allowed three rather than two off-hire periods, otherwise as per Addendum No. 2 – Clause 2.
3. The charter hire between the first and second off-hire will be $ 14,000 per day, the charter hire between the second and third off-hire will be $ 21,500 per day, whilst the charter hire for the balance of the period will be $ 18,500 per day.

All other terms and conditions remain unchanged.

Owners Charterers

# Exhibit B

    USA FLAG VESSEL OWNER, OPERATOR, CHARTERER

HOME | OUR HISTORY | OUR VESSEL | HAWAII SERVICE-MV JEAN ANNE | CHARTER ACTIVITIES | LINKS | CONTACT

**COMPANY HISTORY**

Strong Vessel Operators ("SVO") operated for over 50 years in the USA under the name Van Ommeren Shipping ("VOS"). Initially VOS acted as agents for foreign dry bulk, tanker, liner, heavylift and marine salvage companies. In the late 70's, VOS started to book cargos and ships for it's own account. This was followed by the acquisition in 1984 of the US flag heavy lift vessel "Strong Texan" as part of a consolidation between Dock Express Contractors and VOS.

VOS used to be part of The Van Ommeren Group, a Netherlands based multi-national company involved in tank storage and ocean shipping. Van Ommeren decided to concentrate on tank storage and spun off most of its non-core activities. VOS was spun off in 1997 to US citizen interests. In 1999 the Van Ommeren Group and Pakhoed merged to form Vopak. VOS' license agreement to trade under the Van Ommeren name and logo expired at the end of 2003 at which time the company's name was changed to Strong Vessel Operators LLC.

The name is derived from the prefix STRONG of its U.S.-flag vessels such as that of its first US flag vessel "Strong Texan".

SVO continues VOS' activities unchanged. The company is active as ship owner and ship charterer, with emphasis on U.S.-flag. VOS is a partner in a $ 100.0 million venture with automobile logistics company The Pasha Group to own and operate a 4,300 capacity PCTC (Pure Car Truck Carrier), presently under construction in a US shipyard for delivery end 2004. SVO is interested to expand its U.S.-flag operations and is continually evaluating new projects.

Copyright © 2004 Strong Vessel Operators LLC. All rights reserved.

# Exhibit C

*Exhibit C*

NOURSE & BOWLES, LLP
One Exchange Plaza
at 55 Broadway
New York, NY 10006-3030
Telephone: (212) 952-6200

Facsimile: (212) 952-0345
E-Mail: reception@nb-ny.com
Web site: www.nb-ny.com
Sender's Direct Dial: (212) 952-6202
E-mail: jvayda@nb-ny.com

Nourse & Bowles, LLP
115 Mason Street
Greenwich, CT 06830-6630
Telephone: (203) 869-7887
Facsimile: (203) 869-4535

Nourse & Bowles
75 Main Street, Suite 205
Millburn, NJ 07041-1322
Telephone: (973) 258-9811
Facsimile: (973) 258-1480

December 7, 2007

DEMAND FOR ARBITRATION

BY REGISTERED RETURN
RECEIPT, ORDINARY, AND EMAIL

Strong Vessel Operators LLC
Three Stamford Landing
68 Southfield Avenue, Suite 210
Stamford, CT 06902

svo@vosusa.com

**RE: CHESAPEAKE BAY**
**Charter Party Dated February 3, 1999**

Dear Sirs:

We represent First American Bulk Carrier Corporation ("FABC" or "owners") under the above captioned charter party. Owners have demanded arbitration with Van Ommeren Shipping (USA) LLC ("Van Ommeren") of disputes arising under the above captioned charter party which include claims for indemnity for the (1) verdict and settlement of the Andrews' personal injury suit ($3,268,198.45) plus (2) those attorney's fees ($617,474.20) plus (3) settlement of the Hamilton personal injury suit ($3,616,449.85) plus (4)those attorney's fees ($301,991.32) plus (5) settlement for the crane damage suit ($330,000) plus (6) those attorney's fees ($43,275) which total $8,177,396.82 plus interest.